**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

_____

UNITED STATES OF AMERICA       )
                                       )
      v.                      )      Criminal Case No. 14–270 (RBW)
                                       )
ANTHONY PRYOR and           )
LANCE YARBOUGH,          )
                                       )
            Defendants.     )
_____ )

## MEMORANDUM OPINION

On January 17, 2017, the non-jury trial in this matter commenced before this member of the Court on Count One of the Indictment, which charged defendants Anthony Pryor and Lance Yarbough with conspiracy to distribute and possess with intent to distribute heroin "[f]rom [o]n and around an uncertain date in 2008, and continuing thereafter to [o]n and around October 2012." Indictment at 1, ECF No. 1. Count One further alleges that Anthony Pryor was legally responsible for 100 grams or more of a mixture and substance containing a detectable amount of heroin and that Lance Yarbough was legally responsible for one kilogram or more of a mixture and substance containing a detectable amount of heroin. See id. at 2–3. The bench trial addressing these charges was conducted as a result of the defendants' and the government's waiver of their rights to a jury trial, see Order at 1 (Dec. 22, 2016), ECF No. 624, and the presentation of the evidence concluded on January 30, 2017. What follows are the Court's factual findings and legal conclusions. Based upon those findings and conclusions, the Court finds both defendants guilty on Count One of the Indictment.

## I. EVIDENCE PRESENTED DURING THE TRIAL

The government presented testimony during the trial of the following witnesses: (1) the

Duquesne Police Department Chief Richard Adams; (2) Detective Jason Mikelonis from the Allegheny County Police Department; (3) Federal Bureau of Investigation ("FBI") Special Agent Leonard Piccini, Jr., the lead case agent in this matter; (4) various law enforcement personnel involved in the investigation; and (5) various individuals who participated in the heroin distribution conspiracy charged in this matter, including Ashley Auston, Richard Glenn, Rodney Brown, Isaiah Grier, and Corey Thompson. The government also presented numerous exhibits, including photographs taken during surveillance or recovered pursuant to a search warrant, as well as communications (i.e., text messages and telephone calls) intercepted either pursuant to warrants or conversations with cooperating witnesses. Set forth below is a summary of the relevant testimony and documentary evidence received during the trial.

**A. The Investigation of the Alleged Heroin Distribution Conspiracy**

Special Agent Piccini testified that the investigation into this alleged heroin distribution conspiracy began in 2010 when he was assigned to the Pittsburgh division of the FBI and stemmed from his involvement with the "Manchester OG" case, which was a wiretap investigation into a "violent-based gang" in the north side of Pittsburgh that was allegedly "obtaining . . . large amounts of heroin from . . . multiple sources of supply." Jan. 23, 2017 Trial Transcript ("Tr.") 48:23–24.[1] Several intercepted communications in that case indicated the occurrence of a robbery of an individual named Corey Thompson, see id. at 49:2–3, whom Piccini came to learn "was a member of a group called Hardcore from Duquesne" that was purportedly involved in large scale heroin trafficking, id. at 49:6–7. Based on this information, and given that the robbery of Corey Thompson allegedly involved a significant amount of

_____

[1] Piccini also qualified as an expert in the field of drug trafficking, and in particular, heroin trafficking in the Pittsburgh area. Piccini was permitted to provide expert testimony about the "language used by individuals involved in the drug trade in the Pittsburgh area and also the means by which drugs are trafficked in the Pittsburgh area, including large trafficking activity." Jan. 23, 2017 Trial Tr. 45:23–46:1.

money, Piccini was tasked with investigating this alleged heroin distribution conspiracy. See id. at 49:11–16.

At the outset of his investigation, Piccini sought out law enforcement personnel familiar with the Duquesne area and came in contact with Detectives Mikelonis and Love, as well as Chief of Police Adams, all of whom provided Piccini with information about a group of individuals who called themselves Hardcore Entertainment obtained during a prior heroin trafficking investigation. See id. at 49–50. Hardcore Entertainment was a "rap [music] label," Jan. 17, 2017 Trial Tr. 69:24–25 (Richard Glenn's testimony), comprised of "a group of gentlemen that hung together [and] put some rap videos out," id. at 103:22–24 (Chief of Police Adams' testimony). Christopher Thompson was determined to be the leader of Hardcore Entertainment, and other individuals associated with the group included his younger brother Corey Thompson, and also Clinton Scott Jr., Jivonte Butler, Donte Yarbough, Lance Yarbough, and Taiwan Barlow. See id. at 105; see also id. at 148 (Detective Mikelonis' testimony). In all, approximately thirty to forty people were identified as affiliated with Hardcore Entertainment. Id. at 126:10–14.

As evidence of the individuals affiliated with Hardcore Entertainment who were charged as defendants as a result of the investigation that preceded the filing of this case, the government offered photographs depicting Donte Yarbough, Edward Joseph, Jivonte Butler, Christopher Thompson, Corey Thompson, Clinton Scott, and Lance Yarbough together. One of the photographs was a promotional flyer depicting Donte Yarbough, Christopher Thompson, Clinton Scott, Jivonte Butler, Lance Yarbough, and Taiwan Barlow, advertising the rap music Hardcore Entertainment created. See Gov't Exhibit ("Ex.") 167; see also Jan. 17, 2017 Trial Tr. 105:6–25. Another exhibit was a photograph of these same individuals, among others, standing outside of

the home of Bobby Rogers, which law enforcement and co-conspirators testified was a location frequented by members of Hardcore Entertainment. See Gov't Ex. 174. In this photograph, Donte Yarbough and Christopher Thompson are depicted flashing a "312" signal, see id., which according to testimony represents the house number of a residence where multiple members of Hardcore Entertainment lived when they were younger, see Jan. 17, 2017 Trial Tr. 107:19–108:2. Other photographs included images of large sums of cash, see e.g., Gov't Exs. 321, 324, 327, 328, 330, and screen shots of rap videos depicting Christopher Thompson, Corey Thompson, Jivonte Butler, Taiwan Barlow, Clinton Scott, Lawrence Short, Lance Yarbough and Raheem Brown with large amounts of cash and numerous cellular phones, see e.g., Gov't Exs. 933–50.

According to other testimony presented during the trial, Christopher Thompson established a heroin distribution organization, wherein Khayri Battle, an individual based in Fort Lee, New Jersey, supplied heroin to Christopher Thompson and various members of Hardcore Entertainment for distribution in the Pittsburgh area. See Jan. 20, 2017 Trial Tr. 33:2–13. Rodney Brown, a co-conspirator who pleaded guilty to the charged conspiracy in this case, testified that he assisted Khayri Battle in obtaining the heroin supplied to Christopher Thompson and his organization. See id. at 26:6–15. Rodney Brown also confirmed that Shane Brooks, Taiwan Barlow, and Isaiah Grier, were enlisted as drivers who would travel from the Pittsburgh area to New Jersey, purchase or obtain the heroin, and then transport the heroin back to the Pittsburgh area for distribution. See id. at 26:6–15. According to Rodney Brown, these individuals transported about 1,000 bricks of heroin[2] per week between 2008 and 2012. See id.

---

[2] According to testimony, one brick of heroin is comprised of five bundles, and one bundle is comprised of ten individual stamp bags. See Jan. 18, 2017 Trial Tr. 87:1–4. Testimony from a forensic expert indicated that one brick of heroin contained a substance with a weight of approximately 1.4 to 1.6 grams. See Jan. 23, 2017 Trial Tr. 20:12–21.

at 33–34.  Corey Thompson testified that, between 2008 and 2012, the Pittsburgh area organization was moving "anywhere from probably 500 to 1,000, [to] 2,000 bricks [of heroin] . . . weekly."  Jan. 26, 2017 Trial Tr. 100:8–24.  Additionally, Richard Glenn, a co-conspirator, testified that he frequently purchased heroin from Christopher Thompson between 2009 and 2011 and that he would generally purchase "around 200" bricks of heroin "probably twice a month, [or] once [per] month, depending[]" on his need.  Jan. 17, 2017 Trial Tr. 73.

Special Agent Piccini also "developed an informant-base that was familiar with the activities of the individuals in [Hardcore Entertainment]."  Jan. 23, 2017 Trial Tr. 51–52.  The first enlisted confidential informant was Richard Jones, a party and rap promoter who developed a relationship with Clinton Scott and was aware that Scott was involved with heroin distribution.  See id. at 51:21–52:12.  Through Jones, Piccini was able to arrange a controlled purchase[3] of heroin in February 2011 from Scott.  See id. at 52.  Piccini was also able to arrange a controlled purchase of heroin in July 2011 from Donte Yarbough, see id. at 53–54, the brother of Lance Yarbough and the cousin of Anthony Pryor, see Jan. 17, 2017 Trial Tr. 24:5; see also id. at 28:7–9.  The controlled purchase from Donte Yarbough "occurred at a hospital . . . because Jivonte Butler had been shot due to a robbery, something related to drug trafficking[,] and was in the hospital."  Jan. 23, 2017 Trial Tr. 53–54.  This controlled purchase resulted in the acquisition of 5 bricks of heroin, which upon forensic testing, amounted to 249 stamped bags containing 7 grams of a substance with a detectable amount of heroin.  See Gov't Exs. 463, 464.

---

[3] Piccini testified that a controlled purchase involves a multiple step process.  The first step is to "verify that there is something to purchase" and "that the individual [from whom the purchase will be made] is providing correct information."  Jan. 23, 2017 Trial Tr. 52:24–25.  The next step is to "assemble a team to go out and control the purchase."  Id. at 53:4–5.  An enlisted informant, who is "searched beforehand and searched after the buy," id. at 53:6, is "direct[ed] . . . to the location to conduct the buy.  The buy is [then] complete[d].  There's a predetermined meeting location afterwards.  [Law enforcement officials then] meet [with the informant], obtain the heroin, conduct a debriefing, take the heroin to the FBI building and submit it to evidence control," id. at 53:12–16.

The next phase of Piccini's investigation involved preparing Title III affidavits for the purpose of obtaining subscriber information for the various telephones used by Clinton Scott, Corey Thompson, and Donte Yarbough, as well as to intercept their communications. Jan. 23, 2017 Trial Tr. 66–67. Piccini and Corey Thompson testified that it was common for individuals involved in large-scale drug trafficking either to change their telephone numbers frequently or to carry multiple cells phones as a means "to thwart law enforcement." Id. at 67:13; see also id. at 67–68; Jan. 26, 2017 Trial Tr. 102:11–16. They also testified that it was common for drug traffickers to use language related to marijuana instead of heroin when using telephones to arrange heroin transactions. See Jan. 17, 2017 Trial Tr. 84:1–15; see also Jan. 26, 2017 Trial Tr. 101:11–21. According to Piccini, these tactical maneuvers were also used in this case. See Jan. 23, 2017 Trial Tr. 67–68. Nonetheless, the FBI was able to intercept heroin-related communications of Clinton Scott, Corey Thompson, and Donte Yarbough for over a period of 30 days. See id. at 67–68.

From these intercepted communications, Piccini testified, at times as an expert, about several key components of the organization and their efforts to distribute heroin. See Jan. 23, 2017 Trial Tr. 25–46 (qualifying Piccini as an expert in heroin trafficking). Piccini testified that members of the organization sold bricks of heroin that were comprised of individual stamped bags labeled with "unique names." See id. at 84:7–12; see also id. at 55:19–56:21. Corey Thompson testified that the labels for the bags were stamped with the names of movies. See Jan. 26, 2017 Trial Tr. (Part II) 36:19–22. For instance, some of the stamped bags were labeled Transformer, Avatar, Lucky 7, and Breightling. See Jan. 26, 2017 Trial Tr. (Part I) at 114–115. According to Piccini, the labeling of the stamped bag was critical, as the labeling was often tied to the quality of the heroin, and the quality of the heroin was always important because that is

how a distributor determined which heroin to purchase.  See id. at 55–56.  Piccini also testified about the price members of the organization sold bricks of heroin, see id. at 86:19–24, and that at times, members would "front" heroin by allowing customers to purchase the heroin on credit similar to a loan, see id. at 87:13–17.  Raheem Brown and Corey Thompson corroborated Piccini's testimony regarding the fronting aspect of the conspiracy.  See Jan. 17, 2017 Trial Tr. 80:3–6; see also Jan. 26, 2017 Trial Tr. 100:1–7.

As noted earlier, the government offered as evidence numerous intercepted phone calls, recordings, and text messages.  Part of these intercepted communications included telephone calls on August 12, 2011, between Donte Yarbough and Jeffdyn Rushton, who at the time of the call held a higher position in the conspiracy than Donte Yarbough.  See Jan. 23, 2017 Trial Tr. 90:1–3.  During these conversations, Donte Yarbough expressed his concerns about the price Jeffdyn Rushton and Christopher Thompson were seeking for the purchase of bricks of heroin. See Jan. 24 Trial Tr. 19–23.  Also intercepted were a series of text messages between Donte Yarbough and several customers or lower-level re-distributors.  For example, Donte Yarbough exchanged text messages with Marlon Robinson regarding a transaction for the purchase of 3 bricks of Transformer stamped bags of heroin.  See id. at 25–28.  Another set of intercepted communications involved Donte Yarbough facilitating a sale to Stevie Woods of 7 bricks of Avatar stamped bags of heroin.  See id. at 29–34.  Other intercepted communications also exposed Donte Yarbough negotiating another transaction with Anthony Coles for the sale of bricks of Breightling stamped bags of heroin.  See id. at 36–37.

Additional intercepted communications concerned Corey Thompson arranging for a transaction with Jarrell Spring for the purchase of bricks of Breightling stamped bags of heroin. See id. at 38–39.  Also, some of the intercepted communications consisted of a set of text

messages between Corey Thompson and Marlon Robinson regarding another transaction for bricks of both Lucky 7 and Breightling stamped bags of heroin, as well as a telephone call between Corey Thompson and Marlon Robinson regarding the quality of the heroin Marlon Robinson had purchased from Corey Thompson. See id. at 39–42.

Thereafter, between December 2011 and January 2012, FBI agents and local law enforcement officials conducted surveillance of a black Jeep Cherokee that was registered to Shane Brooks. See Jan. 23, 2017 Trial Tr. 100–102. The surveillance revealed Isaiah Grier meeting with Christopher Thompson at Thompson's home, and GPS tracking disclosed that this Jeep Cherokee made approximately five round trips between Pittsburgh and New Jersey during this approximate one-month period of time. See Jan. 23, 2017 Trial Tr. 101. On January 20, 2012, FBI agents and local Allegheny County law enforcement officials conducted a traffic stop of the Jeep Cherokee, which at the time was being driven by Isaiah Grier and was traveling from the New Jersey area into the Pittsburgh/Duquesne area. See Jan. 17, 2017 Trial Tr. 112–113 (Chief of Police Adams' testimony); see also id. at 127:6–12. Isaiah Grier, who was working on behalf of Khayri Battle, testified that he was transporting heroin that was to be delivered to Christopher Thompson. See Jan. 20, 2017 Trial Tr. 124:1–2. A search of the Jeep Cherokee, which contained a concealed trap for storing money or drugs, see Jan. 23, 2017 Trial Tr. 103:5–15, resulted in the seizure of 226 bricks of heroin, see Jan. 17, 2017 Trial Tr. 113–14, and forensic testing of the recovered heroin confirmed the presence of heroin with a total weight of 339 grams, see Jan. 23, 2017 Trial Tr. 13–20. Isaiah Grier estimated that he made approximately five other trips during which he transported heroin from New Jersey to the Pittsburgh area, and from his observations, these trips involved a greater amount of heroin than the amount of heroin recovered after he was stopped and the Jeep Cherokee was searched by the authorities. See Jan.

20, 2017 Trial Tr. 124–25.  Neither defendant was present at the time of this event.  See Jan. 17, 2017 Trial Tr. 127:6–12.

On February 22, 2012, both Christopher Thompson and Corey Thompson were arrested.  See Jan. 23, 2017 Trial Tr. 105.  Christopher Thompson was detained following his arrest, and Corey Thompson began cooperating with law enforcement with respect to this investigation.  See id. at 105–06.  After Christopher Thompson's detention, Donte Yarbough assumed the leadership role for "the Pittsburgh portion of the heroin distribution" operation.  Jan. 20, 2017 Trial Tr. 39:1–5.  To discuss and formalize the new hierarchy of the Pittsburgh component of the operation, Khayri Battle, Rodney Brown, Donte Yarbough, Lance Yarbough, Jivonte Butler, and Lawrence Short met at a Dave & Buster's restaurant and arcade in the Pittsburgh area.  See id. at 41:16–24.  Another point of discussion at this meeting was Khayri Battle providing heroin to Donte Yarbough in return for the money Khayri Battle owed Christopher Thompson that was not paid before Christopher Thompson's detention and for any additional money that Donte Yarbough would provide.  See id. at 42:8–18.  Rodney Brown recalled another meeting that was held at a Renaissance Hotel in Newark, New Jersey, where he and Khayri Battle met with Donte Yarbough, Lance Yarbough, Jivonte Butler, and several other individuals.  See id. at 45–47.  At this meeting, Donte Yarbough gave Khayri Battle $40,000 in exchange for heroin.  See id. at 46.  Once Donte Yarbough assumed control over the Pittsburgh component of the heroin distribution operation, Rodney Brown testified that he supplied Khayri Battle with approximately 200 to 300 bricks of heroin per week that was in turn provided to the Pittsburgh component of the organization.  See id. at 48–49.

On August 15, 2012, FBI agents and local law enforcement officials conducted a controlled purchase of 22 bricks of heroin from Raheem Brown and Courtney Washington with

the assistance of Corey Thompson.  See Jan. 24, 2017 Trial Tr. 62.  Forensic testing revealed that

the purchase consisted of 38.2 grams of a substance with a detectable amount of heroin.  See id.

at 111–12.  Two days later, pursuant to information received from Corey Thompson that Raheem

Brown was storing heroin in Brown's house, see Jan. 26, 2017 Trial Tr. 127:20–24, FBI agents

and local Allegheny County law enforcement officials executed a search warrant at Raheem

Brown's residence, see Jan. 17, 2017 Trial Tr. 114:13–20, who had been known to "loaf with"

individuals associated with Hardcore Entertainment, id. at 115:1.  This search warrant resulted in

the recovery of three firearms, "$8,700 in cash, [and] approximately 58 bricks of heroin."  Id. at

115–16.  Forensic testing of the suspected drugs revealed that the drugs amounted to 65.2 grams

of a substance containing a detectable amount of heroin.  See Jan. 20, 2017 Trial Tr. 102–04.

Also recovered during the execution of the search warrant were three cellular phones, and a

search of the cellular phones revealed multiple photographs of Lance Yarbough, Donte

Yarbough, Clinton Scott, Christopher Thompson, and Taiwan Barlow, among other individuals,

pictured either with Raheem Brown or individually, that were taken during the life of the charged

conspiracy.  See Jan. 18, 2017 Trial Tr. 107.  Other photographs stored on the phones included

an image of Raheem Brown in possession of large sums of money, and images of unidentified

individuals with the tattoo of "312" on their bodies.  See Gov't Ex. 277.  Neither defendant was

present when Raheem Brown's residence was searched.  See Jan. 17, 2017 Trial Tr. 129:16–21.

On August 31, 2012, FBI agents and local law enforcement officials arranged another

controlled purchase of 6 bricks of heroin by Donte Yarbough through Corey Thompson.  See

Jan. 24, 2017 Trial Tr. 69–70.  Piccini testified that the manner in which the 6 bricks of heroin

was packaged indicated that the source must have been a "wholesale source" as opposed to a

source that was "selling individual doses to addict-level purchasers."  Id. at 71:12–16.  Forensic

testing revealed that this packaged material had a weight of 6.6 grams and contained a detectable amount of heroin. See Jan. 24, 2017 Trial Tr. 113. On September 6, 2012, FBI agents and local law enforcement officials arranged another controlled purchase of heroin from Donte Yarbough by Corey Thompson, resulting in Donte Yarbough sending Cortez Demery and Willie Means to deliver 30 bricks of heroin. See id. at 75:1–9; Jan. 18, 2017 Trial Tr. 138–139. Forensic testing revealed that the 30 bricks amounted to 21.7 grams of a substance that contained a detectable amount of heroin. See Jan. 24, 2017 Trial Tr. 113–14.

### B. Proof of the Defendants' Involvement With the Alleged Heroin Distribution Conspiracy

#### 1. Defendant Lance Yarbough

Corey Thompson testified that he "grew up" with Lance Yarbough, who "was one of the main persons in the organization." Jan. 26, 2017 Trial Tr. 104:5–10. According to Corey Thompson, Lance Yarbough was "a trusted member of the organization," who sold and stored heroin for the organization. Id. at 104:11–20.

On January 4, 2008, Piccini and local law enforcement officials conducted a traffic stop of a vehicle that was driven by Willie Means and that was occupied by Jivonte Butler, Clinton Scott, and Lance Yarbough as passengers. See Jan. 17, 2017 Trial Tr. 133:14–23. During the search of Lance Yarbough's person, law enforcement recovered "a Glock .9 millimeter pistol" that was loaded with "[fifteen] rounds in the magazine and one live round in the chamber." Id. at 134. Piccini testified that "guns were a part of protecting individuals' drugs . . . and [used for] taking money from other individuals during heroin transactions." Jan 26, 2017 Trial Tr. 83:21–23.

On May 1, 2008, Ashley Auston was stopped for speeding while driving back to the Pittsburgh area after visiting her husband Michael Milton in New York. See Jan. 18, 2017 Trial

Tr. 10. A search of the vehicle driven by Auston recovered "in excess of 600 grams of heroin." Id. at 10:17–18. Similar to this trip, Auston testified that she had made several trips to New Jersey to transport heroin to the Pittsburgh area on behalf of Michael Milton, a "top dog" in Hardcore Entertainment and a good friend Christopher Thompson. Id. at 5. She testified that she made "[p]robably like [twelve] trips" between 2007 and 2008 and that each trip involved transporting approximately the same amount of heroin. Id. at 11:3–7. Auston further testified that she would bring the drugs to two primary locations, depending on to whom she was instructed to deliver the drugs. See id. at 6:4–20. When Christopher Thompson took over the operation after Milton was incarcerated in 2007, Auston would bring the heroin to the "dog pound" where other members of Hardcore Entertainment, including Corey Thompson, Donte Yarbough, Jivonte Butler, and Lance Yarbough, would divide and distribute the heroin among themselves. See id. at 7–9, 14. Although Auston did not go to the "dog pound" after her wedding in December 2007, she testified that at the time of her arrest on May 1, 2008, she was in route to deliver drugs to Christopher Thompson for his organization. See id. at 13. Auston did not indicate the location where the drugs would be delivered to on that date.

The government submitted as evidence several telephone calls between August 19, 2011 and September 3, 2011, between Lance Yarbough and Clinton Scott, wherein they voiced their concerns regarding the organization. See Jan. 24, 2017 Trial Tr. 143–47. Scott was "angry about putting money in for heroin coming back from New Jersey to Pittsburgh and not receiving what was owed to him." Jan. 26, 2017 Trial Tr. 84:8–10. Attempting to pacify Scott, Lance Yarbough responded by stating that he too was waiting on his allocation. See Id. 84:10–14. The government also presented as evidence text messages and telephone calls between Corey Thompson and Lance Yarbough on August 24, 2011, and August 25, 2011, which were

intercepted on Corey Thompson's telephone.  See Jan. 24, 2017 Trial Tr. 133–39.  On the first

call, Corey Thompson asked Lance Yarbough to inquire about the availability of heroin to

supply one his customers.  Id.  Lance Yarbough told Corey Thompson that "miracle mix," a

combination of wet heroin and dry heroin, was available for delivery, and Thompson agreed to

take the mixture.  Id. at 138.  Also during this call, Thompson informed Lance Yarbough that he

had two customers, Marlon Robinson who wanted 7 bricks of heroin, and Clarence Carpenter

who wanted 50 bricks of heroin.  Id. at 131–33, 138–39.  Piccini testified that the call indicated

that Lance Yarbough was acting as a middle man between Corey Thompson and someone higher

up in the organization, presumably his brother Christopher Thompson.  See id. at 138:3–8.  On

the second intercepted call, Lance Yarbough told Thompson to bring Robinson and Carpenter so

that the transactions could be completed, because the organization was able to supply heroin to

them.  See id. at 139:3–5.  Piccini testified, however, that it did not appear that these two

transactions were completed.  See Jan. 25 Trial Tr. 40:13–18; id. 41:8–10.

On October 4, 2012, Piccini enlisted Richard Jones as a confidential informant to arrange

a purchase of heroin from Lance Yarbough.  See Jan. 24, 2017 Trial Tr. 82–89.   In a recorded

conversation, Jones informed Lance Yarbough that he was seeking to purchase between 40 and

50 bricks of heroin.  See id. at 87.  However, this controlled purchase never occurred.  See id.

Then, on October 10, 2012, Lance Yarbough told Jones that he wanted to meet before executing

the transaction.  See id. at 88.  Shortly thereafter, FBI agents and local law enforcement officials

conducted surveillance of the apartment building where Lance Yarbough was residing.  See id. at

89.  Video surveillance showed Donte Yarbough entering the apartment building, see Gov't Ex.

389, and subsequently leaving the apartment building with Lance Yarbough and Jivonte Butler,

see Gov't Ex. 391.  That same day, FBI agents and Allegheny County law enforcement

authorities conducted a traffic stop of a vehicle occupied by Donte Yarbough, Lance Yarbough, and Jivonte Butler, but no drugs were discovered.  See Jan. 18, 2017 Trial Tr. 50–51; 77–78.

On October 18, 2012, further video surveillance resulted in Lance Yarbough being observed returning to his apartment building carrying an H&M store shopping bag.  See Jan. 24, 2017 Trial Tr. 93.  Later that day, FBI agents and Allegheny County law enforcement officials executed a search warrant at Lance Yarbough's residence.  See Jan. 17, 2017 Trial Tr. 121:16–20.  From this search, 125 bricks of heroin were recovered, see Jan. 24, 2017 Trial Tr. 99:7–8, which forensic testing identified as 132.9 grams of a substance containing a detectable amount of heroin, see id. at 115:18–116:3.  Based on the seizure of this heroin, Lance Yarbough pleaded guilty to possession with intent to distribute 100 grams or more of heroin.  See Gov't Exs. 487, 513.

### 2.  Defendant Anthony Pryor

As previously indicated, Anthony Pryor is the cousin of Donte Yarbough and Lance Yarbough.  See Jan. 17, 2017 Trial Tr. 176:13–14.  Despite his family ties, Pryor was not considered to be associated with Hardcore Entertainment.  See id. at 77:4–5.  In fact, Richard Glenn testified that members of Hardcore Entertainment treated Pryor like a "loser" or a "flunky."  Id. at 93:13–16.  Despite that characterization, Corey Thompson testified that Pryor was a "lower-level" member of the organization who bought heroin from multiple individuals in the organization for the purpose of redistributing the heroin he purchased.  See Jan. 26, 2017 Trial Tr. (Part I) 105–106.  Corey Thompson further testified that he did not know Pryor to be a user of heroin throughout the six years that he interacted with Pryor.  See id. at 107:5–16; see also id. at 111:3–13.  Corey Thompson testified that he either sold or fronted on consignment bricks of heroin to Pryor, and generally, the transactions involved 10 to 20 bricks of heroin at

any one time.  See id. at 107:5–16.  According to Corey Thompson, Pryor also provided him feedback from Pryor's customers regarding the quality of the heroin that Corey Thompson had sold to Pryor.  See id. at 107:14–16.  This feedback allegedly assisted Thompson in determining "which heroin [he] should be buying from [his] sources of supply."  Id. at 107:11–19; see also id. at 118:14–21.  This testimony corroborated Piccini's testimony that feedback on the quality of heroin being sold was important to distributors, as that was how distributors gauged which sources of heroin to purchase.  See Jan. 23, 2017 Trial Tr. 55–56.

The government also presented intercepted text messages and phone calls between Corey Thompson and Pryor that concerned Pryor seeking to purchase heroin from Corey Thompson.  See Jan. 26, 2017 Trial Tr. 112–21.  First, the government presented as evidence a series of text messages from August 19, 2011, wherein Pryor informed Corey Thompson that he "need 6."  Id. at 115:11; Gov't Ex. 654.  Corey Thompson testified that Pryor was stating that he needed 6 bricks of heroin because Pryor knew that he "was [only] selling bricks."  Id. at 115:11–18.  The following day, Pryor contacted Corey Thompson, saying that he "need[ed] like 8 to 10 [bricks]."  Id. at 119:20; Gov't Ex. 699.  Two days thereafter, Pryor again contacted Corey Thompson through a text message asking if there was more heroin available.  See Jan. 26, 2017 Trial Tr. 121:5–11; see also Gov't Ex. 717.  Thompson testified that it was not unusual for Pryor to request this amount of bricks of heroin in a short time span.  See Jan. 26, 2017 Trial Tr. 121:8–11.

Piccini testified that he initially learned about Pryor because Pryor was listed as the subscriber for a phone number primarily used by Donte Yarbough.  See Jan. 23, 2017 Trial Tr. 68:14–21.  Piccini identified Pryor as the subscriber of Donte Yarbough's phone because of his conversations with Detective Mikelonis, who testified that he knew about Pryor from his prior

investigations.  See Jan. 17, 2017 Trial Tr. 170:9–11.  Also, after conducting some research, Piccini learned about Pryor's involvement in heroin trafficking, Pryor's heroin possession conviction in 2010, and Pryor's familial ties to Donte Yarbough.  See Jan. 23, 2017 Trial Tr. 69–70.

On March 27, 2010, Pryor was arrested after a high-speed car chase.  See Gov't Ex. 567. Following his arrest, law enforcement found more than $2,000 in cash, four cellular telephones, and a plastic bag filled with hundreds of tiny black rubber bands commonly used to bundle heroin either in Pryor's car or on Pryor's possession.  Id.  In addition, during the high-speed chase, Pryor discarded 172 stamp bags of heroin that were recovered by the authorities.  Id.; see also Jan. 23, 2017 Trial Tr. 70.  Piccini testified that the volume of heroin discarded in conjunction with the other materials found after the arrest indicated that Pryor was involved in the distribution of heroin.  See Jan. 23, 2017 Trial Tr. 70 (noting that the tiny black rubber bands are "used to secure bundles of heroin, ten stamp bag").  As part of its case-in-chief, the government introduced a certified copy of Pryor's conviction resulting from this arrest, see Gov't Ex. 567, and Pittsburgh Police Officer Michael Saldutte confirmed that the individual listed on the certified copy of the conviction is the same Anthony Pryor in this case.  See Jan. 17, 2017 Trial Tr. 135–36.

On August 27, 2011, while monitoring court authorized telephone wiretap, Detective Mikelonis heard conversations about an incident occurring at a local dairy mart.  See id. at 171:7–11.  These intercepted conversations were with "Donte Yarbough, one with Christopher Thompson, [and] one with Edward Joseph . . . [and] in regards to them getting a firearm and getting over to Anthony Pryor because there were individuals there that wanted to harm him." Id. at 171–72.  Based on these conversations, Detective Mikelonis "made a phone call to

Sergeant Dan Thiem of the Duquesne Police Department and advised him there was an individual by the name of Jamont Neal that was trying to secure a firearm to come to Hazelwood to [protect] Anthony Pryor." Id. at 171:9–19. Shortly thereafter, Officer Thiem conducted a traffic stop of a car occupied by both Jamont Neal and Edward Joseph, and when Jamont Neal attempted to run, Officer Theim recovered a firearm that fell from Jamont Neal's person. See id. at 141–42. Detective Mikelonis and other law enforcement officials went to the local dairy mart to set up a perimeter to prevent violence, and thereafter, secured the area. See id. at 172.

On August 31, 2011, FBI agents and local law enforcement officials, through a confidential informant, arranged for a controlled purchase of heroin from Donte Yarbough, but he "had somebody else to make the controlled purchase." Id. at 195:22–23. Detective Ford, who participated in the controlled purchased, observed the confidential informant meet with the individual sent by Donte Yarbough, whom Ford identified as Anthony Pryor. See id. at 196:12–25, 197:1. Although law enforcement officials anticipated the purchase of heroin, the controlled purchased resulted only in the receipt of paper that was packaged as if it was heroin. See id. at 202. In regards to this arranged controlled purchase, the government presented intercepted text messages between Donte Yarbough and Anthony Pryor, wherein Yarbough instructed Pryor to perpetrate a theft by taking the purchaser's money in return for the fake heroin. See Jan. 24, 2017, Trial Tr. 160:8–9. Also, in these text messages, Yarbough instructed Pryor to change the telephone number that he was using under Pryor's name, see id. at 163:1–10, and the two also discussed the allocation of the proceeds from the theft, see id. at 163:15–22. Pryor subsequently contacted Verizon Wireless to change the telephone number used by Yarbough. See Def. Exs. AP-A, AP-B.

## II.    LEGAL STANDARD

As previously noted, the defendants are each charged in Count One of the Indictment with conspiracy to distribute and possess with intent to distribute different amounts of heroin, in violation of 21 U.S.C. § 846.  Under § 846, it is a crime to "attempt[ ] or conspire[ ] to commit any offense defined in this subchapter."  And, the underlying offense of the charged conspiracy in the Indictment is distribution and possession with intent to distribute heroin in violation of 21 U.S.C §§ 841(a)(1) and 841(b)(1)(A)(i).  Based on these statutory provisions, it is a crime to knowingly or intentionally conspire to distribute or possess with intent to distribute both 100 grams and one kilogram or more of a mixture and substance containing a detectable amount of heroin.

Pursuant to § 846, the elements of an illegal drug conspiracy are: (1) that two or more persons agreed to distribute and/or possess with the intent to distribute a controlled substance; (2) that the defendants were a party to or a member of that agreement; (3) that the defendants joined the agreement or conspiracy knowing of its objective to distribute and/or possess with the intent to distribute a controlled substance and intending to join together with at least one other alleged conspirator to achieve that objective; and (4) that the conspiracy involved the type and quantity of controlled substance alleged in the indictment, which in this case is one kilogram or more of a mixture and substance containing a detectable amount of heroin as to Lance Yarbough and 100 grams or more of a mixture and substance containing a detectable amount of heroin as to Anthony Pryor.  See Third Circuit Model Criminal Jury Instructions §§ 6.21.846B and 6.21.841C.

"To prove a conspiracy, the government must establish a unity of purpose between the alleged conspirators, an intent to achieve a common goal, and an agreement to work together

toward that goal." United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999); see also United States v. Kelly, 629 F. App'x 258, 260 (3d Cir. 2015). The government may use circumstantial evidence to prove these elements, and the government is not obligated to "prove that each defendant knew all of the conspiracy's details, goals, or other participants." Gibbs, 190 F.3d at 197. And regarding the amount of controlled substance, the fact finder must make a finding as to the "drug type and quantity as to the conspiracy as a whole, not on a defendant-specific basis." United States v. Garvey, 588 F. App'x 184, 188 (3d Cir. 2014); see also United States v. Phillips, 349 F.3d 138, 143 (3d Cir. 2003) ("The finding of drug quantity for purposes of determining the statutory maximum is, in other words, to be an offense-specific, not a defendant-specific, determination. The [trier of fact] must find, beyond a reasonable doubt, the existence of a conspiracy, the defendant's involvement in it, and the requisite drug type and quantity involved in the conspiracy as a whole."), vacated and remanded on other grounds sub nom. Barbour v. United States, 543 U.S. 1102 (2005).

The government bears the burden of proving beyond a reasonable doubt every element of the charged illegal drug conspiracy before the defendants may be found guilty. See Third Circuit Model Criminal Jury Instructions § 3.06. A reasonable doubt is a doubt which fairly arises out of all the evidence or lack thereof and is

> based on reason, logic, common sense or experience. . . . It is a doubt of the sort that would cause one to hesitate to act in matters of importance in his or her life. It may arise from the evidence, or from the lack of evidence, or from the nature of the evidence.

Id. After considering all the evidence, if a reasonable doubt exists regarding the defendants' guilt as to the drug conspiracy charge against them, they are entitled to the benefit of the doubt and must be found not guilty of the charge. See id.

Finally, because the defendants in this drug conspiracy case are the seller and the buyer

of the controlled substance, consideration must be given as to whether more than a <u>mere</u> buyer-seller relationship existed.  This is so because "a simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish that the buyer was a member of the seller's conspiracy." <u>Gibbs</u>, 190 F.3d at 197. Nonetheless, "even an occasional supplier can be shown to be a member of the conspiracy by evidence, direct, or inferential, of knowledge that he was part of a larger operation." <u>United States v. Woodley</u>, No. 13-113, slip op., at 5 (W.D. Pa. Aug. 22, 2016).  Moreover, in determining whether more than a buyer-seller relationship existed, district courts may consider other factors including: (1) "the length of affiliation" between the defendant and the conspiracy; (2) "whether there is an established method of payment"; (3) "the extent to which the transactions are standardized"; (4) "whether there is a demonstrated level of mutual trust"; (5) whether the transactions involve large amounts of drugs; and (6) whether the drugs were purchased on credit.  <u>United States v. Badini</u>, 525 F. App'x 190, 192 (3d Cir. 2013).  "[T]he presence of one or more of these factors furthers the inference that [a defendant] knew that he was part of a larger operation and hence can be held responsible as a co-conspirator." <u>Gibbs</u>, 190 F.3d at 200.

### III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

Except where the Court makes specific findings to the contrary below, the Court adopts as its factual findings in this case the summary of evidence presented during the trial as set forth above, <u>see</u> <u>supra</u> Part II, and the reasonable inferences that can be drawn from that evidence. Based upon those factual findings and in consideration of the applicable legal principles discussed above, the Court finds that the government satisfied its burden of proving beyond a reasonable doubt that the defendants were involved in a conspiracy to distribute and possess with

the intent to distribute heroin in the Pittsburgh area as alleged in Count One of the Indictment. The Court further finds that the government met its burden of proving beyond a reasonable doubt that the conspiracy involved one kilogram or more of heroin during the time period alleged with respect to Lance Yarbough and 100 grams or more of heroin during the time period alleged with respect to Anthony Pryor. The Court will address each defendant in turn.

### A.    The Existence of a Conspiracy to Distribute Heroin

The Court concludes that the government proved beyond a reasonable doubt the existence of a conspiracy to distribute and possess with intent to distribute large quantities of heroin in the Pittsburgh area during the time alleged in the Indictment. As previously noted, Christopher Thompson, who was the original leader of Hardcore Entertainment, created a heroin distribution organization in the Pittsburgh area that received its supply of heroin from Khayri Battle, an individual who resided in New Jersey. Also at the top of the heroin distribution conspiracy for the Pittsburgh component was Michael Milton, and Jeffdyn Rushton, as well as Donte Yarbough, who assumed leadership of the conspiracy when Christopher Thompson was incarcerated. Under these individuals were several distributors, including Corey Thompson, Richard Glenn, Clinton Scott, and Jivonte Butler. Each of these individuals provided funds to purchase heroin from Khayri Battle, and they acquired varying amounts of heroin for distribution based on the amount of funds they contributed.

Moreover, under these individuals were lower-level distributors who would purchase heroin from the major distributors for redistribution in the Pittsburgh area. These lower-level distributors included Marlon Robinson, Jarrell Springer, Willie Means, Clarence Carpenter, Edward Joseph, and Stevie Woods. The conspiracy also had multiple individuals who participated as couriers who transported money from the Pittsburgh area to New Jersey and the

heroin from New Jersey to the Pittsburgh area using vehicles that contained hidden compartments designed to conceal the money and heroin. These couriers, who made multiple trips to New Jersey and back to the Pittsburgh area transporting substantial amounts of heroin, included Ashley Auston, Shane Brooks, Taiwan Barlow, and Isaiah Grier, in addition to other individuals.

The government presented testimony from various law enforcement personnel tasked with investigating this heroin distribution conspiracy and the various individuals who participated in the conspiracy. Each of these witnesses provided testimony that the Court finds credibly demonstrated the existence of the conspiracy. In addition, the intercepted communications between members of the conspiracy, the controlled purchases of heroin from members of the conspiracy, and the heroin recovered from the controlled purchases, traffic stops, and during the executed search warrants, all further demonstrated the existence of the charged conspiracy. Accordingly, the Court finds that the government has proved beyond a reasonable doubt the existence of a conspiracy to distribute and possess with the intent to distribute heroin in the Pittsburgh area between 2008 and October 2012, as alleged in the Indictment.

> **B.      Lance Yarbough's Involvement in the Charged Conspiracy**
>
> **1.      Membership in the Conspiracy for the Purpose of Distributing and Possessing with the Intent to Distribute Heroin**

The Court also finds that the government proved beyond a reasonable doubt Lance Yarbough's membership in the conspiracy for the purpose of distributing and possessing with intent to distribute heroin at or about the time set forth in the Indictment. Although Lance Yarbough was incarcerated from October 2008 through August 2011, a significant portion of the time period alleged in the Indictment, the evidence nonetheless clearly demonstrated that Lance Yarbough was a knowing participant and had a substantial role in the charged heroin distribution

conspiracy while he was not incarcerated.

First, the government offered various pieces of evidence showing an affiliation between Lance Yarbough and several members of the charged heroin distribution conspiracy. At the outset, in January 2008, Lance Yarbough was arrested after law enforcement conducted a traffic stop of a vehicle occupied by Willie Means, Clinton Scott, and Jivonte Butler, members of the charged conspiracy, and found a firearm on Lance Yarbough's possession. Also, several photographs and testimony revealed that Lance Yarbough had an affiliation with members of the charged conspiracy that dated back to his childhood years growing up in Duquesne. And the most undeniable evidence of affiliation is the fact that Lance Yarbough is the brother of Donte Yarbough, an individual who the parties do not dispute played a significant role in the charged conspiracy.

Furthermore, after executing a search warrant at Lance Yarbough's residence on October 18, 2012, FBI agents and local law enforcement officials recovered 125 bricks of heroin. See United States v. Rodriguez, 961 F.2d 1089, 1092 (3d Cir. 1992) ("When a defendant is found in possession of a sufficiently large quantity of drugs, an intent to distribute may logically be inferred from the quantity of drugs alone."). Prior to this arrest, FBI agents and local law enforcement officials attempted to make a controlled purchase of approximately 50 bricks of heroin from Lance Yarbough through a confidential informant, and Lance Yarbough wanted to meet with the confidential informant before executing the transaction. Eventually, Lance Yarbough decided not to consummate the heroin transaction with the enlisted confidential informant, which leads the Court to conclude that he possessed a certain level of sophistication regarding heroin transactions. Also prior to this arrest, law enforcement officials conducted a traffic stop of a vehicle occupied by Donte Yarbough, Lance Yarbough, and Jivonte Butler, and

on another occasion video surveillance showed Donte Yarbough and Jivonte Butler entering Lance Yarbough's apartment building. Also, after the execution of a search warrant and ultimately the recovery of heroin from his residence, Lance Yarbough pleaded guilty to possession of heroin with the intent to distribute.

Moreover, a number of intercepted communications further revealed Lance Yarbough's participation in the charged conspiracy. For instance, Lance Yarbough and Clinton Scott held in depth conversations about Scott apparently distancing himself from Hardcore Entertainment and other members of the conspiracy. In these conversations, Scott told Lance Yarbough that he was upset because he had not received the heroin that he was owed for the money he contributed to the operation. Lance Yarbough informed Scott that he too was waiting on his allocation of heroin, and once the shipment of heroin arrived, he told Scott that Lawrence Short possessed it. In their conversations, Lance Yarbough and Scott also discussed other members of the conspiracy, including Christopher Thompson, Corey Thompson, and Lawrence Short, heroin transactions, and meeting with Scott at Bobby Roger's home, which was identified as a common location for conducting heroin transactions by members of the conspiracy. Contrary to Lance Yarbough's position that these communications are not evidence of his intent to conspire to distribute heroin with other members of the conspiracy, the Court finds these communications highly probative of his knowledge of and participation in the charged heroin distribution conspiracy. Additionally, another set of intercepted communications involved Corey Thompson and Lance Yarbough discussing the possibility of supplying Thompson with heroin for two of his customers, Marlon Robinson and Clarence Carpenter. Lance Yarbough eventually informed Thompson that he could supply the requested heroin, 7 bricks for one customer and 50 bricks for the other customer. And even though neither of these two heroin transactions came to fruition,

these conversations clearly exhibited Lance Yarbough's knowledge of the existence of the conspiracy and his role as one of its members.

Finally, testimony from co-conspirators demonstrated that Lance Yarbough was a knowing participant of the conspiracy and shared a common purpose with other members of the conspiracy to distribute heroin in the Pittsburgh area. Ashley Auston, Rodney Brown, and Corey Thompson each testified that Lance Yarbough was a primary member of Hardcore Entertainment, with Thompson testifying that he and Lance Yarbough were co-equals in the conspiracy. Ashley Auston recalled seeing Lance Yarbough receiving heroin that was transported from New Jersey. Rodney Brown recalled attending two meetings when Lance Yarbough was present. The first meeting concerned the change of leadership in the Pittsburgh component of the conspiracy after Christopher Thompson's detention, and the other was a meeting at a luxury hotel, where $40,000 was exchanged between Donte Yarbough and Khayri Battle for the purchase of heroin. Consequently, testimony from several co-conspirators identified Lance Yarbough as an active participant in the conspiracy.

Despite all of this evidence, Lance Yarbough contends that the Court should not find credible the testimony of Ashley Auston, Rodney Brown, and Corey Thompson. As to Ashley Auston, Lance Yarbough argues that her testimony was inconsistent and only raised additional factual questions about the weight that should be given to her testimony primarily because she testified that she did not go to the "dog pound" after her wedding in December of 2007, and that when she made deliveries she never went inside the residence. However, the Court does not find Auston's testimony to be inconsistent in light of her statement that she made approximately twelve trips between 2007 and 2008, including the trip that resulted in her arrest in May 2008. Also, even though it occurred before her wedding, Auston testified that she visited the "dog

pound" on various occasions with her husband Michael Milton. On these occasions, she testified that she witnessed multiple members of Hardcore Entertainment, including Lance Yarbough, receiving some of the heroin that had been transported to that location by other members of the conspiracy. Thus, Auston's testimony credibly identified Lance Yarbough as a participant in the charged conspiracy prior to his incarceration in October 2008.

With respect to Rodney Brown, Lance Yarbough contends that Brown lied to investigators upon being initially interviewed after his arrest. The fact that Brown essentially admitted that he lied to investigators upon his arrest does not wholly undermine his credibility. As Brown candidly acknowledged, he did not initially disclose everything to investigators because he did not know how much information they had on him or his counterparts. Also, he stated that he had not received any information regarding how his cooperation would alter the charges he anticipated receiving. Even so, critical to the assessment of Brown's credibility is the fact that he had no incentive to falsely implicate either of the defendants. Brown was not guaranteed any assurance that testifying at the trial in this matter would result in a reduction of his sentence or even that the government would request that his sentence be reduced. Also pertinent to his credibility is the fact that he did not seek to embellish his testimony, but rather provided only minimal evidence of Lance Yarbough's involvement in the conspiracy. Further, had he testified untruthfully at the trial, he would be subjected to a perjury charge, a consequence of which he was fully aware. Lance Yarbough also argues that the government did not offer any evidence (i.e., surveillance photos, receipts for meals or the hotel stay) to corroborate that the two meetings identified by Brown did in fact occur. While this is true, the government did offer a recorded conversation between Corey Thompson and Khayri Battle, wherein they discussed Donte Yarbough's new role as the leader of the Pittsburgh area component of the conspiracy and

the exchange of money in excess of $40,000 to purchase heroin.  And Corey Thompson's testimony regarding the change in leadership further corroborates Brown's testimony.  In essence, other evidence, including testimony from a co-conspirator, corroborates Brown's testimony, and therefore, the Court finds his testimony to be credible.

In regards to Corey Thompson, Lance Yarbough relies on Thompson's demeanor during his testimony, his unreliable track record, and his plea agreement as reasons to discredit Thompson's testimony.  Lance Yarbough notes that Thompson rarely made eye contact with his attorney and gave responses that were broad and devoid of in-depth details.  Lance Yarbough also notes that Thompson admitted to being a drug dealer, committing multiple robberies, and using drugs during the time period alleged in the Indictment.  The Court finds that while Lance Yarbough's reliance on these factors raises legitimate concerns, they are insufficient to undermine Thompson's credibility.  The Court reaches this conclusion because Thompson's demeanor is reasonably understandable from the mere fact that he was testifying against and in the presence of two defendants with whom he grew up or had a close friendship for a substantial amount of time.  And even though he received an extremely light sentence given his sizeable role in the charged conspiracy due to this cooperation, Thompson provided law enforcement credible information on multiple occasions that led to the seizure of substantial amounts of heroin and the arrest of other co-conspirators.  Although he admitted to committing robberies and selling and using drugs, Thompson's testimony identifying his and Lance Yarbough's involvement in the charged conspiracy were corroborated by the intercepted communications and the testimony of law enforcement officials and some of his co-conspirators.  Thus, the Court finds Thompson's testimony regarding Lance Yarbough's knowledge of and participation in the charged conspiracy credible.

In sum, although Lance Yarbough was incarcerated from October 2008 until August 2011, the government's evidence clearly demonstrates that he shared a unity of purpose with members of the conspiracy, had an intent to distribute heroin in the Pittsburgh area, and participated in the efforts to achieve that goal. Lance Yarbough's prior conviction for possession with intent to distribute heroin, the intercepted communications and the testimony of his co-conspirators confirming his participation in the conspiracy, and evidence of him possessing large amounts of cash without a legitimate source of employment or other explanation for having such wealth—all of which occurred during the time period alleged in the Indictment—lead the Court to the conclusion that there is no reasonable doubt that Lance Yarbough was a member of the charged conspiracy and had the specific intent to achieve the objectives of the conspiracy.

### 2. The Quantity of a Mixture and Substance Containing a Detectable Amount of Heroin the Government Proved Lance Yarbough is Accountable for as a Member of the Conspiracy

Having concluded the existence of the charged conspiracy to distribute and possess with intent to distribute a quantity of a mixture and substance containing a detectable amount of heroin and Lance Yarbough's membership in that conspiracy, the Court must now determine the amount of this controlled substance the government proved Lance Yarbough is accountable for. The government bears the burden of proving beyond a reasonable doubt that the quantity of the controlled substance involved in the conspiracy as a whole, and need not prove the quantity separately attributable to each co-conspirator. See Garvey, 588 F. App'x at 188; see also United States v. Gilliam, Nos. 02:12–cr–93; 02:13–cr–235, 2015 WL 5178197, at *3 (W.D. Pa. Sept. 4, 2015) ("Once the [fact finder] makes a finding as to the drug quantity attributable to the conspiracy as a whole, the sentencing judge must determine, by a preponderance of the evidence, the drug quantity attributable individually to each convicted [d]efendant. If a [d]efendant is

convicted of conspiracy, he/she is responsible for the quantity involved in the entire conspiracy, not just the quantity of drugs with which he/she was individually involved." (internal citations omitted)).

The finding of the quantity of drugs involved in the conspiracy attributable to the defendant must be based on his own conduct and the conduct of conspirators reasonably foreseeable to him.  See Third Circuit Model Criminal Jury Instruction § 7.03.  And, the conduct of co-conspirators is reasonably foreseeable to a defendant if the conduct is "a necessary or natural consequence of the [conspiracy]."  Pinkerton v. United States, 328 U.S. 640, 648 (1946).  Considering the evidence presented during the trial, the government argues that it proved beyond a reasonable doubt that the quantity of heroin attributable to defendant Lance Yarbough is one kilogram or more.  The Court agrees.

Based on the evidence presented during the trial, law enforcement authorities seized sizeable amounts of substances containing a detectable amount of heroin during the course of the conspiracy as alleged in the Indictment and while Lance Yarbough was not incarcerated.  As already noted, in May 2008, law enforcement officials seized in excess of 600 grams of a heroin mixture that Ashley Auston was attempting to deliver to Christopher Thompson.[4]  In January 2012, law enforcement recovered approximately 339 grams of a heroin mixture during a traffic stop of a Jeep Cherokee driven by Isaiah Grier from New Jersey to the Pittsburgh area.  Both of these co-conspirators testified that they made several trips similar to the ones that led to their arrests, and further testimony indicated that several other couriers were making weekly trips from the Pittsburgh area to New Jersey to bring back heroin.  Additionally, in August 2012, a

---

[4] Although Lance Yarbough was arrested in January 2008, his counsel indicated throughout the trial and in his submissions concerning his proposed findings of fact and conclusions of law that Lance Yarbough was not detained until October 2008.

controlled purchase of heroin from Raheem Brown recovered 38.2 grams of a heroin mixture, and a search warrant executed at Raheem Brown's residence recovered 65.2 grams of a heroin mixture. Not even including the other controlled purchases that resulted in the recovery of heroin mixtures, these events alone exceed the one kilogram threshold. And although Lance Yarbough was not present during the seizure of the heroin mixtures at the time of any of these events, intercepted communications, evidence of affiliation, and the testimony of co-conspirators all demonstrate that Lance Yarbough was fully aware of the amount of heroin mixtures the conspiracy was distributing in the Pittsburgh area.

Moreover, Lance Yarbough was observed receiving heroin, attending meetings regarding matters concerning the conspiracy, performing a substantial role in the conspiracy, and even facilitating heroin transactions with other members of the conspiracy. Also, various co-conspirators testified that the conspiracy distributed at minimum 1,000 bricks of heroin per week. While the Court recognizes that Lance Yarbough was incarcerated for the majority of the time period alleged in the Indictment, the amount of heroin the conspiracy distributed when he was not imprisoned remains attributable to him given his role in and knowledge of the charged conspiracy.

Outside of the occurrences already referenced, a search of Lance Yarbough's residence recovered 133 grams of a substance containing a detectable amount of heroin, which corroborates testimony from co-conspirators that Lance Yarbough often stored heroin at his residence for members of the conspiracy. Accordingly, the Court finds that the conduct of the co-conspirators in this case was reasonably foreseeable to Lance Yarbough, as that conduct was a "necessary [and] natural consequence of the [conspiracy]." Pinkerton, 328 U.S. at 648. Therefore, the Court concludes that the government established beyond a reasonable doubt that

Lance Yarbough was responsible for possessing with intent to distribute and distributing at least one kilogram or more of a mixture and substance containing a detectable amount of heroin as a member in the conspiracy charged in the Indictment.

### C.     Anthony Pryor's Involvement in the Charged Conspiracy

#### 1.     Membership in the Conspiracy for the Purpose of Distributing and Possessing With the Intent to Distribute Heroin

The Court also finds that the government has proved beyond a reasonable doubt Anthony Pryor's membership in the conspiracy to distribute and possess with intent to distribute heroin at or about the time set forth in the Indictment.  Although Pryor did not have as significant a role in the heroin distribution conspiracy as others who were part of the conspiracy, and even though other members of Hardcore Entertainment considered Pryor to be a "loser" or a "flunky" who was not associated with the organization, the government proved beyond a reasonable doubt that he nonetheless was a knowing participant in the charged conspiracy.

Initially, the Court finds that Pryor was involved in the distribution of heroin during the time period alleged in the Indictment.  Proof of such involvement is the fact that Pryor pleaded guilty to possession with the intent to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin in connection with his arrest on May 27, 2010.  On that day, during a high-speed car chase, Pryor discarded 172 individual bags of heroin from the vehicle he was operating, and upon searching the vehicle, law enforcement officials recovered $2,019 in cash, multiple cellular phones, and a plastic bag containing hundreds of rubber bands commonly used to bundle packages of heroin.  Credible testimony presented during the trial in this case demonstrated that all of these items are consistent with involvement in the distribution of heroin.

Although Pryor's prior conviction alone is not sufficient to establish his participation in

the conspiracy charged in this case, further evidence demonstrates that Pryor shared "a unity of purpose, . . . an intent to achieve a common goal, and an agreement to work together toward that goal," Gibbs, 190 F.3d at 197, which was to sell heroin for profit in the Pittsburgh area, with certain members of Hardcore Entertainment. As previously noted, Pryor is the cousin of Donte Yarbough and Lance Yarbough, both of whom law enforcement officials and co-conspirators confirmed were affiliated with Hardcore Entertainment and held substantial leadership roles in the conspiracy. And, multiple co-conspirators who were part of Hardcore Entertainment testified that they socialized and interacted with Pryor on various occasions.

The record clearly shows that Pryor actively and knowingly assisted Donte Yarbough in furtherance of the conspiracy to distribute and possess with the intent to distribute heroin. For example, Pryor acquired several telephone numbers in his name for Donte Yarbough's use. More significantly, during a controlled purchase of what was supposed to be heroin from Donte Yarbough that was arranged by law enforcement officials through the use of a confidential informant on August 31, 2011, Donte Yarbough instructed Pryor to commit a theft by taking the money from the confidential informant and delivering to him paper disguised as drugs rather than the actual drugs. Pryor executed the theft without the use of any firearms, presumably because Donte Yarbough had previously sold heroin to this confidential informant, which established that a level of trust existed between Donte Yarbough and the informant. After the theft, but on the same day, Donte Yarbough further instructed Pryor to change the cellular phone number listed under Pryor's name but used by Donte Yarbough, and during the same conversation, the two discussed how they were going to divide the proceeds from the theft. Records from Verizon Wireless, Pryor's cellular telephone provider, showed that Pryor did in fact change the number used by Donte Yarbough.

Even though heroin was not recovered through this controlled purchase, Pryor's involvement in this theft through the ruse of a heroin transaction demonstrated "a unity of purpose" with Donte Yarbough and "an intent to achieve [the] common goal" of selling heroin in the Pittsburgh area. Gibbs, 190 F.3d at 197. This is so for several reasons. For starters, in addition to their familial relationship, this event demonstrated an affiliation between Pryor, Donte Yarbough, and the distribution of heroin, and also a level of mutual trust between Donte Yarbough and Pryor sufficient for them to engage in criminal activity with each other. There can be no dispute that individuals would not typically engage in criminal activity together without a certain level of trust in each other. Additionally, the instructions Donte Yarbough gave to Pryor concerning how to commit the ruse suggest that Pryor, at times before this particular robbery, assisted Donte Yarbough in consummating heroin transactions, as there would have been no need for Donte Yarbough to specify what action Pryor was to take during this transaction (i.e., commit a theft rather than exchange heroin) if Pryor had not engaged in drug distribution activity with Donte Yarbough in the past. Finally, this incident is evidence of an agreement between Pryor and Donte Yarbough to work towards the common goal of selling heroin in the Pittsburgh area. And this is further evidenced by Donte Yarbough's request immediately after the theft that Pryor change the cellular number that was subscribed in his name but used by Donte Yarbough, which from the testimony of law enforcement officials and co-conspirators is often done by drug traffickers to evade detection by law enforcement. Consequently, the circumstances surrounding this theft in the guise of a heroin transaction suggest that Pryor was a member of the heroin distribution conspiracy with Donte Yarbough.[5]

---

[5] After being robbed at a local store, Pryor called Donte Yarbough for help, and in response, Donte Yarbough and other members of the conspiracy made efforts to assist Pryor. The government argues that this provides further support of Pryor's membership in the conspiracy. Although the Court agrees with the government that most individuals who were just robbed would generally call the police for help, the Court is not persuaded by the

Also indicative of Pryor's participation in the conspiracy and most damaging to his defense is the testimony of Corey Thompson, a high-level member of the conspiracy. Thompson testified that he interacted with Pryor for a span of six years, and during this time, their relationship mainly involved Pryor purchasing heroin from him. Intercepted text messages and telephone calls between Thompson and Pryor contained several discussions in which Pryor sought to purchase 16 bricks of heroin within two days, and a subsequent call a few days later from Pryor to Thompson requesting more bricks of heroin. Also, in these intercepted communications, Pryor gave Thompson feedback on the quality of heroin he purchased from Thompson, which again according to multiple co-conspirators was important information for a distributor to know in determining whether to purchase more of that particular source of heroin. Thompson further testified that it was common practice for Pryor to request this same amount of heroin. And even though these intercepted communications did not reveal the type of drug involved or the price, Thompson testified that there was no need to discuss the type of drug, price, or methods of delivery because it was already established from their prior dealings. Lastly, Thompson testified that Pryor did not only purchase heroin from him, but also from other members of the conspiracy, including Donte Yarbough and Lance Yarbough.

Contrary to Pryor's argument, the evidence established that more than a mere buyer-seller relationship existed between him and Thompson. As discussed already, their relationship and dealings with heroin bridged approximately six years, and the intercepted communications in conjunction with Thompson's testimony revealed an established payment

---

government's argument that this incident is reflective of a heroin distribution conspiracy or the need for members of the conspiracy to project a lack of fear to deter thefts and to promote the ability of a drug organization to operate without interference from rival organizations. The Court reaches this conclusion primarily because this incident did not involve the purchase or sale of any heroin, and it is not totally beyond the pale that some individuals who have been robbed would call close associates for help.

method, standardized heroin transactions, and a demonstrated level of mutual trust between the two individuals.  Thompson estimated that he alone sold about 100 bricks of heroin to Pryor, an amount inconsistent with a mere buyer-seller relationship, and there were occasions when he would also front or loan on consignment bricks of heroin.  Thus, all of the factors used by the Third Circuit in assessing whether more than a buyer-seller relationship existed apply and indicate that Pryor was part of the heroin distribution conspiracy with Thompson.

Pryor argues that the Court should not find Thompson's testimony credible for several reasons.  Primarily, Pryor contends that Thompson only testified because he was required to do so under his plea agreement and that there were multiple inconsistencies within his testimony.  One of the main inconsistencies Pryor cites is that Thompson testified twice before a grand jury and did not once mention Pryor, but then he testified at the trial in this case that Pryor participated in the conspiracy.  Other inconsistencies asserted by Pryor include Thompson remembering only the telephone numbers for Lance Yarbough and Pryor, even though he had testified that he had a great ability to remember telephone numbers.  See Jan. 26, 2017 Trial Tr. (Part II) 32–34.  Pryor also noted that Thompson had a slouched posture while testifying and only provided one word answers unlike other co-conspirators who gave greater details.

While Thompson's motive to testify to fulfill his obligations under his plea agreement and the inconsistencies identified in his testimony bear on his credibility, the Court does not find that these factors wholly undermine Thompson's credibility, such that his testimony should not be given substantial weight.  With respect to his plea agreement, Thompson had already received and served his sentence, and therefore, he could not receive any additional benefit for testifying against Pryor.  More importantly, Thompson's testimony is corroborated by the multiple instances when he provided law enforcement with accurate information regarding the charged

conspiracy during their investigation. As illustrations, Thompson informed law enforcement that Raheem Brown and Lance Yarbough were storing heroin in their respective homes. This information led to the issuance and execution of search warrants that recovered substantial amounts of heroin at both residences. And Thompson's testimony implicating Pryor as a lower-level participant corroborates the information already obtained by law enforcement officials prior to Thompson's arrest and cooperation. See Jan. 26, 2017 Trial Tr. 35:7–9 (noting that Anthony Pryor was listed as heroin customer on the Title III affidavits). Accordingly, the Court finds Thompson's testimony credible in assessing Pryor's participation in the charged conspiracy.

Even though the government's evidence is not as substantial as it is against Lance Yarbough, the government's evidence is sufficient to establish Pryor's knowledge and participation in the charged conspiracy. While multiple law enforcement personnel and co-conspirators did not affiliate Pryor with Hardcore Entertainment, the government need only prove that there was an agreement between Pryor and at least one other person to distribute heroin. And the government's evidence established that such an agreement existed among at least Pryor, Donte Yarbough, and Corey Thompson. The Court, therefore, finds beyond a reasonable doubt that Pryor was a member of the charged conspiracy to distribute heroin in the Pittsburgh area.

**2. The Quantity of a Mixture and Substance Containing a Detectable Amount of Heroin the Government Proved Anthony Pryor is Accountable for as a Member of the Conspiracy**

Similar to the Court's findings with regard to Lance Yarbough, the Court finds that the government has proved beyond a reasonable doubt that Anthony Pryor's participation in the charged conspiracy involved more than 100 grams or more of a mixture and substance

containing a detectable amount of heroin. Most relevant to the Court's conclusion is Pryor's conviction for possession with the intent to distribute 100 grams of a mixture or substance containing a detectable amount of heroin in connection with an arrest that occurred during the time period alleged in the Indictment.

In any event, this amount of a mixture or substance containing a detectable amount of heroin was reasonably foreseeable by Pryor, given his conduct and participation in the charged conspiracy. Specifically, Pryor assisted Donte Yarbough with conducting a theft during a controlled purchase of anticipated heroin arranged by law enforcement. For the reason noted earlier, this assistance and the instructions given by Donte Yarbough to Pryor suggested that Pryor assisted Donte Yarbough in the distribution of heroin prior to this incident. Additionally, intercepted communications showed that Pryor sought to purchase 16 bricks of heroin (approximately 20 grams) from Thompson in a two day span, and then requested more heroin a few days later. And, Thompson testified that he regularly sold heroin to Pryor and estimated that, in total, he sold Pryor more than 100 bricks of heroin. Therefore, given this evidence and the lengthy relationships Pryor had with Corey Thompson and his cousins, Donte Yarbough and Lance Yarbough, the Court concludes that Pryor personally possessed with intent to distribute or distributed 100 grams or more of a mixture or substance consisting of a detectable amount of heroin and that was reasonably foreseeable that members of the conspiracy to which Pryor was a member were engaged in the same activity with at least the same amount of the same controlled substance.

## IV. CONCLUSION

Based upon the foregoing findings of fact and conclusions of law, the Court finds both defendants Lance Yarbough and Anthony Pryor guilty of the conduct charged in Count One of

the Indictment issued in Criminal Case Number 14-270.

**SO ORDERED** this 21st day of June, 2017.

REGGIE B. WALTON
United States District Judge